| 43 | 295 |
| 110 | 405 |

## No. 10,728.

JAMES WILLIAMS VS. LOUISIANA ELECTRIC LIGHT AND POWER COMPANY.

1. The driver of a float with a heavy load, above the ordinary height, was not guilty of contributory negligence, in veering from one side of a street to the other to avoid collision with a wagon in front, although in thus doing his float and load came in contact with an electric light wire suspended over parts of the street, at a distance of fifteen feet from the ground.

2. The pole which fell and broke plaintiff's thigh was not of the required diameter, and was deficient in quality; it was partly sap, when it should have been heart timber; the wire suspended from it was an obstruction. *Held* that the defendant was not free from fault, and damages are allowed. Streets should be ordinarily safe for travel and transportation over them. Verdict of the jury and the judgment thereon are amended and reduced to the amount of $1000. As amended, judgment affirmed.

APPEAL from the Civil District Court for the Parish of Orleans. *Voorhies, J.*

Williams vs. Electric Light Company.

*Jos. N. Wolfson* and *B. R. Forman* for Plaintiff and Appellee:

1. In the use of a franchise to erect and maintain poles and string wires along the public streets, the grantee is bound to comply strictly with its contract obligations, as to size and quality of poles and height of wires, and in method of erection, construction and maintenance; to use every precaution that prudence and foresight could suggest to make the structure safe to the people using the streets, and when its contract, as well as ordinary prudence, require the poles to be of heart sound timber, not less than nine inches square, forty feet long, and the cranes and wires not less than thirty-five feet from the ground, to avoid obstructions to loaded vehicles, it is gross carelessness and shows a criminal disregard of human life to have maintained a sappy pole (never at any time all heart), rotted away to two or three inches in diameter, and bearing a heavy iron crane and lamp at its end, and four or six heavy wires across a popular and much used street, allowing the wire to sag within fourteen feet of the ground. Wilson vs. Telephone Company, 41 An. 1041.

2. In assessing damages where there is gross negligence and a flagrant breach of public duty, it is proper to blend the interests of society and the injured individual, and to allow such damages as would not only fully compensate the injured person for his injuries, his pain and his sufferings, but also such as would prevent a repetition and serve as a warning. Black vs. R. R. Co., 10 An. 40. Merely compensatory damages allowed in following cases: Choppin vs. R. R. Co., 17 An. 19, loss of a leg, $25,000; Summers vs. R. R. Co., 34 An. 139, broken elbow, $7500; Ketchum vs. R. R. Co., 38 An. 777, loss of arm, $10,000; Wardle vs. R. R. Co., 35 An. 202, shock to spine, $5000; Peniston vs. R. R. Co., 34 An. 778, broken leg, $6000; Barksdell vs. R. R. Co., 23 An. 180, loss of both legs, $15,000; Domingues vs. R. R. Co., 35 An. 751, bruises, $1500; Spring Co. vs. Edgar, 99 U. S. 645, bruises, $6500; City of Panama, 101 U. S. 453, broken arm, $15,000; R. R. Co. vs. Gladman, 15 Wall. 401, $9000; R. R. Co. vs. Stout, 17 Wall. 657, injured foot, $7500; R. R. Co. vs. Herbert, 116 U. S. 642, loss of leg, $10,000; R. R. Co. vs. Mares, 123 U. S. 710, loss of both legs, $20,000; Miller vs. Herves, 1 Woods 363, broken ribs, $8000; R. R. Co. vs. Drysdale, 51 Ga. 644, broken arm, $3000; Westerville vs. Freeman, 66 Ind. 255, broken hip, $2000; R. R. Co. vs. Donahue, 70 Pa. 119, loss of toes, $5216.66; Campbell vs. Portland, 62 Maine 552, $9500.

*Farrar, Jonas & Kruttschnitt* for Defendant and Appellant:

1. Plaintiff, having been injured by the negligence of his fellow-servant, can not recover.

2. That negligence consisted in-the careless driving of a float, drawn by five mules, hauling a tank fifteen feet high and twelve feet broad, weighing four thousand pounds, against an electric light wire, the dangerous location of which to such a high load was well known to him.

3. He failed to take the ordinary precaution of keeping on the side of the street which he knew to be safe. This precludes recovery.

4. As he was driving a clumsy vehicle and an extraordinary high load, it was incumbent on him to keep a sharp lookout for any overhead obstruction well known to him to exist at that locality. He failed to do this.

5. When he was crossed by the float at Erato street, he should have stopped and not sheered off to the known dangerous side of the street.

6. While knowledge of an obstruction to the highway is not conclusive evidence of contributory negligence, it raises a presumption of negligence which must be rebutted by proof. Shearman & Redfield Neg., Section 376, note 1. There is no such rebuttal proof in this case.

7. Conceding, for argument sake, that defendant's wires were lower than and its poles inferior to those required by the City Ordinance, there was no fault on its part if they were in a reasonably safe and proper place.

8. A wire fifteen feet six inches from the top of the street is in a reasonably safe and proper place for all ordinary traffic and use of the street; and if a person uses the street with an unusual and extraordinary load, liable to come in contact with such a wire, and knows of the location of such a wire, and that it is too low for him to pass under, it is his duty to take precautions to avoid it, commensurate with the danger.

9. Three thousand dollars damages for a simple fracture of the fremur, from which a recovery, without bad consequences, takes place in less than two months, is excessive to an old negro drayman over sixty years of age, who was earning $1.25 per diem. Five hundred dollars is ample compensation in such a case.

The opinion of the court was delivered by

BREAUX, J. The pleadings disclose that plaintiff, a drayman, sues the defendant for damages to the amount of $20,000.

He avers that the defendant company had at the intersection of Magazine and Erato streets an electric light crane and wire, which obstructed the use of those streets, as they were swung so low as to be dangerous to passengers; that on October 12, 1889, while he was engaged in hauling, although diligent, he came in contact with the electric light crane, and by reason of its defective and negligent construction of this wire and crane, and by reason of the rottenness of the pole supporting them, the crane fell on him; broke his thigh, laming and crippling him for life; caused him great pain and rendered him less able to earn his livelihood.

The defendant in answer pleads that its poles and wires and the lamp and crane under discussion are lawfully upon the streets of the City of New Orleans, in a safe and proper place, for lighting purposes; and that the plaintiff met with an accident by his own gross fault and negligence; that he was hauling with a float along Magazine street a heavy iron tank, fifteen feet high, and that the driver drove his float against the crane, and continued to drive his mules until the tank pulled the crane and pole down upon the plaintiff; that the plaintiff should have taken good care, as he was on the highway, on a float with a heavy load, much above the ordinary heights of float

loads; that if this crane and wire were any obstruction to the streets they were only such to this unusual load; that they were clearly visible; that the plaintiff was fully acquainted with the location; he had driven loads several times, up the same street, and had taken ordinary precautions to avoid them, which he had failed to take at the time of the injury.

\*        \*        \*        \*        \*        \*        \*        \*

There was a verdict and judgment for the plaintiff for $3000. The defendant appeals.

\*        \*        \*        \*        \*        \*        \*        \*

The record discloses the facts of which the following is a statement: On the 12th day of October, 1889, the plaintiff and Henry Simmons, another colored drayman, were employed by John Connelly, a boss drayman.

They had twelve large iron tanks to haul, from the corner of Thalia and Magazine streets to an oil mill in Gretna.

The most direct route was that taken.

These tanks weighed 4000 pounds each. They were loaded on floats; the load and float were in height sixteen feet.

Three of these tanks had been safely hauled over this street without accident.

One of them had been hauled the morning previous to the collision.

Between one and two o'clock P. M. they were hauling the fourth tank. Simmons was driving and the plaintiff was sitting on the float, behind the tank, eating his dinner.

The testimony of the witnesses is conflicting as to the side of the street the float was on as it approached Erato street. The side of the street on which he was, has bearing, for the reason that the wire was higher from the ground on the left than on the right side. The defendant contends that it swung too low on the right hand side of Magazine for him to pass; that he was aware of this and had always previously, because of these wires, crossed Erato street on the left hand side. Three witnesses, including the driver of the float, testify that the float was on the right hand side going up; that he was hindered from continuing in the direction intended, by timber wheels driven by one Foster, coming out Erato street across Magazine, in front of the float. He requested the driver of the timber wheels to stop, but the latter drove on.

That to avoid the collision he sheered off but did not get over to the left side of the street in time; the tank caught the wire and pulled the pole down.

Other witnesses testify that he was on the left side of the street; that in veering to avoid the timber wheels he did not return to the left of the street, despite his attempt, in time to escape the accident.

The driver evidently pulled to the right to let pass the wagon in front and then attempted to pulled back to the left side of the street to avoid the wire, but this brought the top of the tank into contact with the electric wire and by the weight against the wire caused the pole to fall.

This wire and others were suspended near the top of this pole and from this pole upon the right hand side of the street it swagged within fifteen feet of the ground. There was also a heavy crane resting on it, used to suspend an electric light lamp.

The rotten pole, made weak by decay, broke off close to the ground and fell upon the plaintiff and broke his thigh.

Immediately after the driver stopped his mules.

The pole in question was an eight by eight pine pole which had been in the ground about four years.

The lamp had been located by the City Surveyor.

The contract with the city required that the poles should be heart timber, not less than nine inches square at the ground, and that the lamps should be suspended upon cranes, the latter not less than thirty-five feet from the ground.

The pole was of the required height.

*        *        *        *        *        *        *        *

It is in place to state, if Simmons, the driver of the float, was negligent, the plaintiff does not question that he being his fellow-servant, can not recover.

*        *        *        *        *        *        *        *

We must now determine whether plaintiff or his fellow-servant was guilty of contributory negligence.

The question is not free from difficulty.

On the left side of the street they had passed a number of times at the place of the accident and might again on that side have passed without accident.

The driver and the witnesses who testify on the subject, state that he was attempting to return to that side but was prevented.

When near Erato street, suddenly the street was obstructed by timber wheels.

It became necessary for this driver to act promptly.

He had asked the timber wheel man to stop; he did not.

In that difficulty several alternatives presented themselves:

To drive on and collide with the timber wheels and mules and incur great risks.

To stop, or to veer to the right and return to the left.

The first could not be thought of, as between the second and third he selected the latter.

Even if there had been an error of judgment in the emergency of the moment it would not have been carelessness or neglect. In driving to the right there was no rashness, but a desire of avoiding a threatening collision in front.

The counsel for defendant urges that plaintiff had knowledge of defects or danger in the highway; that he was not driving an ordinary wagon carrying an ordinary load, but a very clumsy, unwieldy vehicle, pulled by five mules. Had the plaintiff freely chosen to drive under the low swung wire and had negligently driven the tank against it, the principle involved would apply. In the haste of the moment he did that which, possibly, any prudent driver would have done.

\*          \*          \*          \*          \*          \*          \*          \*

But the defendant company's pole and wire were an obstruction. Under its contract with the city, poles of heart timber, not less than nine inches square, were to be put up. The pole in question was not of heart timber, and because of the sap it had badly decayed just above the ground. Its power of resisting was, at least, one-half less than it should have been.

While it is not necessary that all electric wires should swing as high as plaintiff's counsel contend they should, they should be placed at an elevation more than fifteen feet from the ground, when suspended across a highway.

Ordinary care and diligence should be exercised against decay and weakening of timber from age or the action of the elements.

"Municipal corporations must take notice of the tendency of timber to decay, and whenever the exercise of ordinary care involves the anticipation of defects that are natural and ordinary results of use and climatic influences, and there is neglect on the

part of the proper officer to make a sufficiently frequent examination of a particular structure, a city will not be relieved from liability although the defects may not be open and notorious." Elliott, Roads and Streets, p. 462.

The foregoing, although relating to the diligence required of municipalities, is not entirely without application. With reference to the wires over a part of the "traveler's path" in the thoroughfare, we find the applying rule, viz:

"When a road or street is opened and public travel is invited thereon it must be made reasonably safe for such travel. *Ib.* p. 455. See also Wilson vs. Telephone and Telegraph Co., 41 An. 1043.

It was proven that this load and float were not exceptional in height.

Cartmen haul at times loads equally as high, even higher.

    \*     \*     \*     \*     \*     \*     \*     \*

The question of damages requires our careful attention. Plaintiff was confined to bed at the Charity Hospital from the 12th day of October to the 7th of December. On the last mentioned day, on the advice of his physician, he attempted to walk; in the attempt he fell and his leg was fractured at the healing place. He remained in bed two months longer.

Plaintiff's wages were $1.25 a day.

He is not entirely disabled.

He can perform good many forms of work as well as before.

He is on the decline of life and without the injury his usefulness in doing work requiring strength would be on the wane.

But the unfortunate accident has none the less made a dent in this humble man's life we can not entirely straighten or completely remedy.

We fix the damages at an amount we think will compensate actual loss and in part the suffering endured.

The defendant was at fault, but the negligence was not gross. The carelessness was not great.

We can not agree with the jury insofar as relates to amount of damages.

The amount must be reduced to $1000.

It is therefore ordered adjudged and decreed that the verdict of the jury and the judgment thereon be amended so as to reduce the amount to $1000, with interests as allowed, and that thus amended said judgment be affirmed at appellee's costs.